**William A. BRANDT, Jr., assignee of Crescent Corporation, Plaintiff,**

v.

**SCHAL ASSOCIATES, INC., et al., Defendants.**

No. 85 C 357.

United States District Court, N.D. Illinois, E.D.

May 2, 1990.

George Spellmire, Joshua G. Vincent, Hinshaw, Culbertson, Moelmann Hoban & Fuller, Chicago, Ill., for plaintiff.

Jeff D. Harris, Foran, Wiss & Schultz, Chicago, Ill., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SHADUR, District Judge.

This massive contract-based dispute between a construction management firm and a contractor found its way into federal court solely because of the contractor's allegations that the management firm and others had violated the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968 ("RICO"). After plaintiff then voluntarily dismissed those RICO claims, Schal Associates, Inc., Richard Halpern and Evans Spileos (collectively "Schal Defendants") tendered the seemingly inevitable motion for sanctions under Fed.R.Civ.P. ("Rule") 11. This Court's August 16, 1988 memorandum opinion and order (the "Opinion," 121 F.R.D. 368[1]) found that each of the three complaints filed by plaintiff's attorney David L. Campbell ("Campbell") was not well-grounded in fact and had therefore violated Rule 11. Opinion at 389 granted Schal Defendants' motion and directed them to file a proposal for the amount of sanctions in conformity with the "Appropriate Sanctions" section of the Opinion.

What then ensued was a battle between the fee petitions and Campbell's arguments opposing imposition of monetary sanctions, culminating in a four-day evidentiary hearing in July 1989. In the wake of that hearing each party submitted proposed findings of facts and conclusions of law, responsive submissions and voluminous documentation.

In accordance with Rule 52(a), this Court finds the facts specially as set forth in the following Findings of Fact ("Findings") and states the following Conclusions of Law ("Conclusions"). To the extent if any that the Findings as stated reflect legal conclusions, they shall be deemed Conclusions; to the extent if any that the Conclusions as stated reflect factual findings, they shall be deemed Findings.

---

**1.** Citations to the Opinion will take the form "Opinion at —," referring to the page number in 121 F.R.D. but omitting the volume number to avoid superfluity.

*Findings of Fact* [2]

1—60. This Court adopts, as its Findings 1 through 60, Schal Defendants' Proposed Findings of Facts ¶¶ 1–60 (Appendix A to this opinion).

61. Now that he has withdrawn and waived his previously-asserted "ability to pay" issue (see Finding 60), Campbell poses essentially three lines of defense to the fee petitions submitted by Schal Defendants:

(a) Their attorneys' fees and expenses were unreasonable because they failed to mitigate the damages caused by Campbell's Rule 11 violations.

(b) Both the amount of time and the resources spent on their various legal activities were excessive, duplicative and unreasonable in the context of the litigation.

(c) Any award of the monies requested by Schal Defendants is not necessary to serve the deterrent function of Rule 11, and such an award would have a serious and negative impact on Campbell's physical and mental health.

For the reasons stated in the Conclusions, only a single factor somewhat related to Campbell's line of defense (b) succeeds in persuading this Court to award Schal Defendants something less than they ask.

62–70. This Court adopts, as its Findings 62 through 70, Schal Defendants' Proposed Findings of Fact ¶¶ 62–70 (Appendix B to this opinion), but with the deletions indicated in Appendix B.

71. This Court adopts, as its Finding 71, Schal Defendants' Proposed Finding of Fact ¶ 142 (Appendix C to this opinion).

72. For the period July 26, 1989 through November 30, 1989 Schal Defendants claim $8,843.25 in additional expenses, including professional fees for Jerome Torshen ("Torshen"), deposition transcription fees, transcript of the evidentiary hearing and computer-assisted research (see Fourth Supplemental Fee Schedule Ex. 3).

73. As the Conclusions reflect, this Court has independently reviewed the time spent by Schal Defendants' counsel and finds it reasonable under the circumstances of this case as described in these Findings and Conclusions. In addition, Schal Defendants called Torshen as an expert witness.[3] Torshen described his work in preparation for that task (Tr. 391–94) and opined not only on the reasonableness of the requested hourly rates (Tr. 394–95) but also more importantly on the reasonableness of the fees sought to be recouped by Schal Defendants for the Rule 11 violations. Both that ultimate opinion and its underpinnings (Tr. 395–404) were thoughtful and persuasive. They were undisturbed on cross-examination (Tr. 404–09). This Court finds Torshen's testimony was wholly credible and provides further ample support for the Conclusions stated hereafter.

*Conclusions of Law*

*Jurisdiction*

1. Neither side has questioned this Court's jurisdiction to resolve the current dispute (nor did either of the parties or this Court raise that question when the Opinion was written). Because the United States Supreme Court now has under consideration the question whether such jurisdiction continues to exist after a plaintiff's voluntary dismissal of the underlying action (*Cooter & Gell v. Hartmarx Corp.,* —— U.S. ——, 110 S.Ct. 2447, 110 L.Ed.2d 359; see report of the Feb. 20, 1990 oral argument at 58 U.S.L.W. 3539–40), it should be said at the outset that this Court (like our Court of Appeals; see, e.g., *Wojan v. General Motors Corp.,* 851 F.2d 969, 971–73 (7th Cir.1988)) has always given an affirmative answer to that question. It holds that jurisdiction does indeed exist here.

---

**2.** These Findings incorporate by reference the background and procedural history of this long and tortured case as set out in Opinion at 370–74.

**3.** After direct examination, supported by his curriculum vitae, as to Torshen's impressive qualifications (including qualifications directly related to expertise on the subject of fee petitions and reasonableness of fees in major litigation (Tr. 384–89)), Campbell's counsel interposed no objection to Torshen as an expert witness in that area (Tr. 389).

*Mitigation*

■ 2. *Dubisky v. Owens*, 849 F.2d 1034, 1037 (7th Cir.1988) (citations omitted) articulates this familiar proposition:

> A party defending against a frivolous paper has a duty under Rule 11 to mitigate its legal fees and expenses by resolving frivolous issues quickly and efficiently. Counsel "must mitigate damages by correlating his response, in terms of hours and funds expended to the merits of the claims."

Despite Campbell's repeated assertions to the contrary, nothing in the extensive record of this case suggests that Schal Defendants failed to mitigate the damages caused by Campbell's Rule 11 violations.

3. Schal Defendants' strategic decision to launch an attack on the legal sufficiency of Campbell's asserted RICO claim, the sole basis for federal jurisdiction over the case, does not demonstrate a failure to mitigate their Rule 11 damages. This Court explicitly noted in Opinion at 389: [4]

> Relatedly, Schal is entitled to all its fees and expenses in researching the RICO issues on the dismissal motions—even when it ultimately lost those motions. Had Campbell not brought the factually unsupported complaints, there would have been no need for Schal to challenge the legal sufficiency of his allegations. In "but for" terms, the fact that Schal's arguments were sometimes mistaken is irrelevant—it should have never had to make them in the first place.

Nonetheless Campbell has now asserted that Schal Defendants should not be entitled to the fees related to those motions because they could have, and more importantly *should* have, launched an early fact-based attack on the Complaint instead of their repeated legal objections. These Con-

clusions will comment briefly on each of Campbell's unpersuasive arguments in support of that position.

4. Schal Defendants' fact-oriented response to the state court complaint, which took the form of a September 20, 1985 summary judgment motion, in no way obligated them to respond in kind to the original federal court complaint (which contained RICO allegations together with a prayer for $50 million in treble damages). Several reasons support that view:

(a) Schal Defendants had reasonable legal grounds for challenging the RICO Count under Rule 12(b)(6). At that time the unsettled state of RICO law made the legal sufficiency of any RICO allegation a legitimate question deserving of judicial attention. Add to that the fact that a favorable resolution of the Rule 12(b)(6) motion would result in dismissal of the case in its entirety for lack of jurisdiction, obviating *any* need for further expenditure of legal resources in this District Court, and the reasonableness of Schal Defendants' approach becomes readily apparent.

(b) As of the fall of 1985 Schal Defendants had no way of knowing whether a fact-based challenge to the RICO Count would have been successful, just as they had no way of knowing whether a legal attack would win the day. They did not receive a ruling on the parallel fact-based attack in the state court case until 1987, and Schal Defendants' *belief* that they had a meritorious factual argument did not require them to forgo the opportunity to make a potentially dispositive legal argument at the appropriate stage of the federal case.[5]

(c) It was not at all clear from Schal Defendants' exante vantage point at the

---

4. Opinion, *id.* had just pointed out that Campbell's basic Rule 11 violation had come when he, wholly without warrant, made a federal case out of the parties' dispute. That meant that everything Schal Defendants did in this action was something that "would not have been incurred 'but for' Campbell's ill-conceived filing of this action."

5. Any court, including this one, must be careful to read the obligation to mitigate on the part of

any counsel who seeks to defend against a meritless filing in the context of that same counsel's obligation to represent his or her client zealously (ABA Code of Professional Responsibility DR 7–101). Surely it was in the interest of all the Schal Defendants to have allegations of racketeering against them dismissed as early as possible, and there is no doubt that a Rule 12(b)(6) motion is an eminently rational way to pursue that end.

time they had to make their decision that pursuing a fact-based attack from the beginning would have proved less expensive than attempting the legal dismissals. It is a moral certainty that the corollary to any fact-based attack (under either Rule 56 or Rule 16) on the RICO Count at such an early stage in the lawsuit would have been extensive discovery—something that could be accomplished only at large expense to each of the parties. Campbell's assertion that such discovery would have largely been unnecessary due to the already-completed state court motion simply fails to persuade: It makes no sense to assume that the factual underpinnings of a $50 million RICO claim would have been summarily adjudicated without extensive discovery requests from both parties.

Furthermore, the fact that much of the discovery ultimately had to be performed anyway cannot be used to asperse the reasonableness of Schal Defendants' strategic decision in the first instance. It takes no flight of imagination to perceive the current mitigation argument as being turned on its head had Schal Defendants followed the path Campbell now argues they should have. In that case Campbell or his current representatives would in all likelihood be asking something along these lines:

> Why did defendants file a complex factual attack requiring substantial discovery, when they could simply have filed a Rule 12(b)(6) motion potentially disposing of the entire case without subjecting both sides to needless discovery costs [6]?

5. Campbell's mitigation arguments targeting Schal Defendants' Rule 12(b)(6) motion as to the FAC are sheer nonsense. Not only does the already-stated analysis apply with equal force here, but it is really a complete answer that this Court granted that motion on its merits. It can hardly be deemed unreasonable for defendants to object to palpable legal deficiencies in a complaint—things that if not properly and timely cured would result in dismissal of the action. Enough said.

6. According to Campbell, the " 'centerpiece' of this Rule 11 proceeding" is Schal Defendants' motion to dismiss or, in the alternative, for summary judgment on the SAC. Again all the reasons that justified the filing of legal attacks on the earlier complaints defeat Campbell's second-guessing of that renewed Rule 12(b)(6) motion. And as to the summary judgment prong of that motion Campbell's argument, though slightly more complex, is still meritless. In essence Campbell maintains that Schal Defendants should have made precisely the same arguments in that context as they did in the state court summary judgment motion, thereby avoiding any need for extra work: As Campbell would have it, Schal Defendants should have concentrated on knocking out the alleged Northwestern scheme instead of directing their energies to the OMM allegations. That line of argumentation conveniently overlooks the setting in which this litigation was then taking place. Schal Defendants' central focus from the inception of the federal case had been the lack of a "pattern" sufficient to support the RICO charge, and that (understandably and reasonably) continued to be the core of their defense. With this Court already having determined that the Northwestern allegation standing alone could not support the legal charges of the complaint, it was entirely reasonable and even wise for Schal Defendants to attack the basis of the supplementary allegations offered by Campbell to save his RICO charge from certain death. Indeed this Court directed Schal Defendants to address the alleged OMM scheme—after dismissing Northwestern as a party defendant this Court said (664 F.Supp. 1193, 1200 (N.D.Ill.1987) (emphasis added)):

> If the alleged racketeering activity consisted not in the backcharge mailings, but rather in the mailings inducing Crescent to do extra work on each of the

---

**6.** Not only would that argument have been foreseeable under the posited circumstances, but it would have had substantial merit. After all, even though Schal Defendants' first motion to dismiss failed as against the original complaint, their second such motion directed against the FAC (virtually a carbon copy of the original complaint) was granted by this Court, which then noted substantive legal deficiencies in that complaint as alleged.

Northwestern and One Mag Mile Projects (in each instance intending not to pay for the work and thus defrauding Crescent), *it becomes important to see whether that factual description fits the One Mag Mile events.* If not, the only true racketeering activity would·involve the Northwestern Project and Schal Defendants would stand in the same position as Northwestern itself.

7. Despite the demonstrable logic of Schal Defendants' actual approach, Campbell asserts that they nonetheless should have simply argued the lack of factual support for the fraud allegations underlying the Northwestern branch of the alleged pattern—an argument for which they had the state court motion as a blueprint. This Court does not comment on the relative wisdom of that approach,[7] but it must observe that the same principles that inform the mitigation of damages doctrine in traditional torts cases apply with equal force in this setting. For that reason Schal's eminently reasonable decision is protected by the teaching in *Federal Insurance Co. v. Sabine Towing & Transportation Co.,* 783 F.2d 347, 350–51 (2d Cir.1986):

> If the course of action chosen by the plaintiff was reasonable, the plaintiff can recover despite the existence of another reasonable course of action that would have avoided further damage.[8]

Rule 11 provides that the injured party may receive "reasonable expenses," and what constitutes reasonable expenses must be determined on the facts of each case.

8. Equally lacking in merit is Campbell's claim that *Dubisky* and *United Food & Commercial Workers Union Local No. 115 v. Armour & Co.,* 106 F.R.D. 345 (N.D. Cal.1985) establish that Schal Defendants should have mitigated their damages by an informal and early pointing up, to both opposing counsel and Judge Bua, of the frivolous nature of the claims lodged against them. It is profitable to contrast those cases with the situation here:

(a) In *Dubisky* the face of the complaint revealed faulty allegations of diversity jurisdiction, which the Court of Appeals found should have been (1) readily apparent to all parties and (2) therefore dealt with through informal · channels (by phone call or letter) rather than by a full blown motion to dismiss. It is obvious twaddle to suggest that a phone call or letter to Campbell stating that the Schal Defendants did not believe that plaintiff had a meritorious case would in any way have resulted in an expedited resolution of this case. Campbell had the most graphic awareness of Schal Defendants' skepticism as to the factual underpinnings of the alleged Northwestern scheme by way of the state summary judgment motion—but that knowledge did not at all deter Campbell from pursuing the federal court claim. This was a complex, multi-million dollar lawsuit that Campbell intended to and did litigate tooth and nail.[9] Even if counsel for Schal Defendants may have harbored any suspicion that Campbell's actions in bringing the charges might prove sanctionable, nothing suggests

---

**7.** It is worth noting that at the time that "centerpiece" motion was filed the state court summary judgment motion had not yet been ruled on. That motion was ultimately disposed of on July 8, 1987.

**8.** [Footnote by this Court] Ah, how easy it seems to be to occupy the seat of Campbell's present counsel and to second-guess decisions made by counsel for Schal Defendants at a time when they were laboring under the in terrorem threat of a RICO claim with a massive ad damnum. If Campbell had possessed even a tiny fraction of the prescience that his present lawyers now seek to fault Schal Defendants' counsel for failing to exhibit, none of this whole wasteful process (to say nothing of the enormous expense involved)

would have been suffered by anyone—including this Court.

**9.** One of this Court's earliest ventures into the RICO opinion-writing business describes all too well the obvious lure that Campbell found in RICO's prospect of an award of treble damages plus attorneys' fees (as well as his obvious recognition of the pressure for settlement that such a prospect would create). As *Fields v. National Republic Bank of Chicago,* 546 F.Supp. 123, 124 (N.D.Ill.1982) (footnote omitted) put it:

> But like the myth of the lemming drawn to the sea, he follows the unfortunately all-tooprevalent trend of seeking to reshape the claim into one that can be wrapped in the RICO mantle.

that their having said so would have been viewed as anything other than a typical defense lawyer's downgrading of the claim against his or her client—a standard litigation ploy. It would be ludicrous to say now that Schal Defendants had an obligation to make futile gestures aimed at calling off plaintiff's all-too-eager hounds.

(b) *United Food*, 106 F.R.D. at 349 similarly held that the party injured by a Rule 11 violation was not entitled to recover all the attorneys' fees requested because the use of formal motion procedures was inappropriate in light of the availability of informal means of resolving the dispute. There the plaintiff unions had sued an employer for failure to arbitrate a grievance when the employer had in fact agreed to arbitrate. Unions' complaint simply misrepresented the facts, and plaintiffs were sanctioned for filing the frivolous suit. But the employer was not allowed to collect all its legal expenses because of its failure to point out the obvious factual misrepresentation to the trial judge at an early status conference, instead filing a costly formal motion in violation of its duty to mitigate. In part *United Foods, id.* said:

> Federal judges no longer sit totally removed from the case until the trial; they are increasingly becoming involved in managing the course of the litigation from an early point in the life of the case. The federal rules explicitly authorize the techniques of case management, and in particular, the status conference. Fed.R.Civ.P. rule 16.

From that unexceptionable statement of the case management aspect of the judge's role, Campbell argues that Schal Defendants breached their duty to mitigate by failing to bring the frivolous nature of this suit to the attention of Judge Bua early in the proceedings. Again that notion cannot succeed in light of the dramatic difference between this case and the factually simple situation presented in *United Foods* (as in *Dubisky*). There was no simple statement that counsel for Schal Defendants could have made at an early status conference that could have resulted in a speedy resolution of this dispute. They did believe that they had the facts on their side, and they did believe that they could prove no fraudulent scheme existed as to the Northwestern Project (hence the state court summary judgment motion)—but there was no way they could casually walk into a status conference and deliver a brief oral statement that would resolve the frivolous issues of this case. Each complaint contained extensive and complex factual allegations, and that was equally true of the proof needed to show their baselessness. *United Foods, id.* at 350 (emphasis added) specifically observes:

> *In finding that Armour had this duty to mitigate here, the court stresses the simple state of the facts.* The obvious misrepresentation of the facts by Unions' counsel was well known to Armour. The very reason why Unions' counsel's action in this case were so egregious, makes this the kind of case were [sic] Armour should have immediately brought the frivolity of the action to the court's attention.

In sum, nothing in the record of this case suggests the existence of any information that could have been brought to the attention of Judge Bua informally so as to resolve this case in its early stages.[10] That being so, Campbell's arguments in this regard simply amount to another objection that Schal Defendants failed to launch a factually-oriented attack instead of their

---

10. Although the conclusions stated in the text would apply in all events (and should not be viewed mistakenly as limited to the specific judicial context in which they are framed), Campbell's contention carries even less persuasiveness—if possible—in light of the original random calendar assignment of this case. Judge Bua's abilities to resolve even the most bitter conflicts short of trial are so well known as to approach legendary status. It is much like carrying coals to Newcastle for Campbell to urge that the kind of argumentative statement that could then have been made by Schal Defendants' counsel really had to be offered to assist the prospects for early disposition of the case—or would have made a difference if such a statement had in fact been offered.

motions to dismiss. That position, having been fully addressed earlier, requires no further attention here.

9. Given this Court's just-completed conclusions that Schal Defendants have in no way breached their duty to mitigate damages under Rule 11, Campbell's final argument under this heading is readily dispatched: Except perhaps to the extent that this Conclusion must be tempered to reflect less than total success for Schal Defendants in recovering the attorney's fees they seek here (a subject covered later), they are equally entitled to *all* their reasonable attorney's fees expended in this Rule 11 proceeding. Fees on fees are a common consequence of a motion such as this (*Borowski v. DePuy, Inc.*, 876 F.2d 1339, 1342 (7th Cir.1989)), and the applicable standard is again one of reasonableness under all the circumstances. That test has been met here.

### Reasonableness of Schal Defendants Attorneys' Fees and Expenses

■ 10. This Court has recently had occasion to speak to the problems posed by the task thrust on judges in this type of proceeding (*Koval v. PaineWebber Housing & Healthcare Funding*, 128 F.R.D. 654 (N.D.Ill.1989)). Accordingly these Conclusions will not seek to improve on the views expressed there—they were the product of studied reflection on all aspects of the fee-shifting process, especially on the difficulties in "trying to reconstruct the reasonableness of fees viewed from the outside and in hindsight" (*id.* at 657). There is surely a great deal of force—sufficient to merit the attention of courts at a higher level, and not simply to relieve district judges of the burdens of hour-by-hour parsing of voluminous time records—to the idea

that if fee-shifting is decided to be a proper remedy for a Rule 11 violation in a case such as this, that shifting ought to be total. After all:

(a) Civil RICO contains no provision for a prevailing *defendant* to recover its attorneys' fees, although a winning *plaintiff* is statutorily entitled to a fee award under 18 U.S.C. § 1964(c).

(b) That creates the maximum *disincentive* for defense counsel to expend needless or unreasonable time in a RICO case, not only because the client (and not the opponent) must bear defense counsel's fees in the ordinary course but also because any unnecessary proliferation of time and effort on the defense side will almost certainly produce matching expanded efforts on the plaintiff's side, thus doubling the amount at risk for defense counsel's client if the lawsuit is lost and the plaintiff gets an award of fees under the statute.

Those considerations of wholly rational motivations for lawyer conduct, coupled with a sense that the Rule 11 offender rather than its victim ought to bear the cost of any doubt that a court might harbor from its external hindsight perspective, could well lead to a straight fee-shifting approach. But as *Koval* made plain, unless and until that approach gains approval from the rulemakers in this area, this Court will continue to discharge the task marked out by *Jardien v. Winston Network, Inc.*, 888 F.2d 1151, 1160 (7th Cir. 1989) and like cases.[11] Having said that, though, this Court has taken the view that unless there is some real reason (and not just carping) to support a finding of unreasonableness in the scope and amount of fees incurred on Schal Defendants' behalf and paid for by Schal Defendants without

---

**11.** It bears mention, however, that both *Jardien* (an ADEA case) and all the cases that it cites (*Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), *Lenard v. Argento*, 808 F.2d 1242, 1244 (7th Cir.1987) and this Court's opinion in *Roe v. City of Chicago*, 586 F.Supp. 513, 514 (N.D.Ill.1984)—all Section 1983 cases) involved statutes where the prevailing party was entitled to a fee award as a matter of *right*. In such cases the client is rarely at risk at all (usually such a client has minimal or no

liability for fees incurred if the lawsuit loses), so that the problem of lawyer accountability or lack of it is dramatically different from that in the paying lawsuit such as this one. When the losing party in such a paying lawsuit is then sought to be taxed with the fees of opposing counsel incurred in fighting a Rule 11–violative claim, the call for judicial examination of the fees billed to and paid by a solvent client certainly appears to be really different in kind and not merely degree.

protest, the amount of those fees should be considered presumptively reasonable.

### 1. Category A—General Litigation Services [12]

11. Subcategory 1 includes approximately 36 hours expended primarily by Harris and senior partner Richard Schultz ("Schultz") in initially analyzing the Complaint and the background of the case. Schal Defendants maintain that time expenditure was reasonable because (a) the Complaint was over 50 pages long, (b) it was exceedingly difficult to comprehend the precise nature of the allegations being made and (c) the background of the construction projects at issue was extensive.

Campbell denies that an experienced lawyer would "reasonably" expend 36 hours on the task described. He maintains the complaint was not exceedingly difficult to understand but rather was essentially the same as the state court Northwestern complaint with the mere addition of the alleged predicate acts.

This Court has (for better or worse) had more experience than even the most experienced practicing lawyer with civil RICO complaints.[13] But this Court too found Campbell's Complaint opaque, and it did not (as did defense counsel's clients, Schal Defendants) face a potential multimillion dollar judgment if it were to err in identifying and handling the issues involved. This Conclusion is merely the first of a repeated series of this Court's rejections of hindsight evaluations by Campbell's counsel[14]—it would be entirely inappropriate for this Court to hold that the expenditure of time by defense counsel in this area was unreasonable based on any such retrospective and result-oriented approach. In sum, this Court finds that the entire portion of the claim represented by this subcategory is reasonable.

12. Subcategory 2 includes approximately 35 hours expended by associate Christine McGoey ("McGoey") on a motion for a stay pending the Supreme Court's opinions in *Haroco* and *Sedima*. Schal Defendants maintain the time expenditure was reasonable in light of Crescent's opposition to the motion, which necessitated briefing.

Campbell denies that what he characterizes as spending 35 hours on a three-page motion and nine-page supporting memorandum, which he says cited boiler-plate propositions calling for the exercise of the court's discretion, was either reasonable or necessary.

Like the rest of Campbell's current objections, this one ignores Campbell's own combative litigation style and the fact that—to make a lame joke—Campbell sought to make a federal case out of every issue, however small. Witness Torshen's characterization of Campbell's tactics (Tr. 400–01) was entirely accurate. Under all the circumstances the time claimed was reasonable.[15]

---

**12.** At the evidentiary hearing Schal Defendants divided the services rendered in Category A of Finding 70 into approximately 21 subcategories. These Conclusions deal with each of those subcategories in turn.

**13.** Early this month this Court is scheduled to participate as the judge panelist on a nationally advertised seminar on RICO litigation—the most recent in a substantial number of such involvements over the past several years. In partial preparation for that seminar it has run "RICO" and "Shadur" on LEXIS, and the resulting printout reflects more than 80 opinions authored by this Court discussing one or more facets of the law under that statute.

**14.** Counsel for Campbell (an able member of the firm that has apparently been retained by Campbell's malpractice insurance carrier) refuses to recognize how easy and misleading it is to

contend—now that the successful defense of the underlying lawsuit is over—that defense counsel should have known they could win with the expenditure of less effort. Our Court of Appeals Chief Judge William Bauer has characterized an appellate judge as "someone who comes on the scene after the battle is over and shoots the wounded." That refreshing and candid acknowledgement of the second-guessing aspects of the appellate function probably lessens the temptation of any appellate judge who reflects that kind of attitude to engage in such second guessing. Unfortunately it finds no counterpart in the arguments that have been advanced on Campbell's behalf here.

**15.** This is pretty much the last Conclusion in which anything other than a summary statement approving the requested fees will be included. That however should not be mistaken

13. Subcategory 3 relates to Schal Defendants' Rule 12(b)(6) motion to dismiss the Complaint and all of the related research, analysis and preparation of opening and reply memoranda in support of the motion. Of the approximately 268 hours included in this sub-category, 227 hours were expended by then-partner Ken Sullivan ("Sullivan"), who (unlike Harris) had already had considerable prior RICO experience. Sullivan's research and briefing included a number of specific issues: (a) "income," "pattern," "injury" and "enterprise" issues under RICO, (b) the basis for alleging fraud as an underlying predicate act, (c) Rule 9(b) pleading requirements for fraud and (d) whether there can be a conspiracy between a corporation and its officers. Schal Defendants maintain that the complex nature of those issues, complicated by the Complaint's factual allegations as well as by the inclusion of claims under each subsection of 18 U.S.C. § 1962, rendered the expenditure of 268 hours on that motion reasonable.

Campbell counters that he perceives it as inconceivable that Sullivan, a lawyer with nine years of experience, a federal clerkship and a working knowledge of RICO would require more than six straight weeks of eight-hour days to research and draft a motion to dismiss.

This Court concludes, based on its review and the already-identified considerations, that the time involved was entirely reasonable.

14. Subcategory 4 includes 30 hours expended in preparing Schal Defendants' Answer to the Complaint, most of which is attributable to Harris' several meetings with Schal representatives as well as communications with counsel for co-defendants in relation to the Answer.

Campbell contends that 30 hours is an excessive amount of time to answer a complaint that had been exhaustively analyzed in connection with the motion to dismiss.

This Court concludes, based on its review and the already-identified considerations,

that the time involved was entirely reasonable.

15. Subcategory 5 includes 22 hours expended by McGoey in researching the possibility of filing a renewed motion to dismiss the Complaint in the wake of a newly issued opinion by Judge Bua in which he discussed the RICO pattern requirement. McGoey spent those hours reviewing Judge Bua's opinion and other RICO "pattern" opinions that had been issued since Judge Bua's denial of the initial motion to dismiss.

Campbell contends that 22 hours represents an excessive amount of time to read the limited number of relevant opinions that had been issued in the specific time period and maintains that a substantial amount of McGoey's time was spent in educating herself on RICO generally.

This Court concludes, based on its review and the already-identified considerations, that the time involved was reasonable.

16. Subcategory 6 includes approximately 24 hours expended by associate John Foran ("J. Foran") in researching Crescent's assignment for the benefit of creditors and preparing a memo in opposition to Crescent's motion for leave to amend.

Campbell lodges three objections to this time expenditure: (1) three eight-hour days is an excessive amount of time for examining the question whether Crescent or Brandt was the real party in interest, (2) J. Foran's time entries are "extremely vague" on this subject, reflecting only "legal research re assignment issue" and (3) the issue could have been resolved informally without the necessity of 24 hours of briefing.

This Court concludes, based on its review and the already-identified considerations, that the time involved was reasonable.

17. Subcategory 7 includes 163 hours expended primarily by Harris and J. Foran in connection with the motion to dismiss the FAC, including both the supporting memoranda and the reply brief. Schal De-

as reflecting a lack of attention by this Court to the issues. Instead the remaining summary conclusions simply reflect this Court's determi-

nation that all of the factors previously referred to support a repeated finding of the total reasonableness of the requested fees.

fendants claim that time expenditure was reasonable in light of the magnitude of the charges in the FAC, the complexity of the law, and the focus in Campbell's responsive brief on the claimed predicate acts and his unfounded attempt to impose Rule 11 sanctions on Schal Defendants.

Campbell answers that this time expenditure was not reasonable because (1) a good deal of research and analysis on the claims preceded the filing of the motion and (2) the 163 hours yielded only a seven-page motion to dismiss, citing just three cases, and a 15–page reply brief that cited only 13 cases.

This Court concludes, based on its review and the already-identified considerations, that the time involved was reasonable.

18. Subcategory 8 includes approximately 46 hours of research regarding mail fraud conducted by associate Karen A. Suizzo ("Suizzo"). Suizzo prepared a file memorandum on her research and, at Harris' direction, did additional research on the relationship of mail fraud to the overall fraud claim and on the progeny of *United States v. Maze*, 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974) (which this Court had cited to the parties at a hearing).

Campbell objects that 46 hours was an excessive amount of time to research this point, which had already been dealt with in the first motion to dismiss addressing all the predicate acts. Additionally he maintains that Suizzo's time entries reflecting only "research re mail fraud" are vague and, without her supporting testimony, cannot substantiate an award for the time involved.

This Court concludes, based on its review and the already-identified considerations, that the time involved was reasonable.

19. Subcategory 9 includes 30 hours of research and file memoranda drafting by Suizzo on the alleged predicate act of extortion.

Campbell here repeats his objection lodged as to subcategory 8.

This Court concludes, based on its review and the already-identified considerations, that the time involved was reasonable.

20. Subcategory 10 includes approximately 12 hours of work by Suizzo in researching the distinctions in the work product doctrine under federal and Illinois law. That work was requested by Harris, who was considering retaining certain consulting experts with respect to the Northwestern project.

Campbell objects that Harris, as an experienced litigator, must have had the relevant rules readily available to him and shouldn't have required an associate's aid on such a simple point. Additionally he notes that with no Suizzo testimony on how she spent her time on the issue, no award is appropriate.

This Court concludes, based on its review and the already-identified considerations, that the time involved was reasonable.

21. Subcategory 11 includes approximately 10 hours of research and memorandum drafting as to the case law under Rule 12(e), to determine whether Schal Defendants could move for a more definite statement regarding the alleged fraudulent scheme on OMM that appeared in the SAC. Suizzo performed that research and wrote a related memorandum to the file.

Campbell maintains that 10 hours of research was unreasonable on a routine motion addressed to the court's discretion, especially in light of the lack of testimony from Suizzo.

This Court concludes, based on its review and the already-identified considerations, that the time involved was reasonable.

22. Subcategory 12 includes 15 hours expended by Suizzo in researching and writing a memorandum on common law fraud. That research was independent of any work done on mail fraud and RICO.

Campbell denies the reasonableness of this time expenditure, noting that the elements of common law fraud should have been familiar to an attorney with Harris' experience and that Suizzo's time notations fail to identify any particular objective of this research. He concludes that Suizzo's time was spent on her own education and not on work valuable to the litigation.

This Court concludes, based on its review and the already-identified considerations, that the time involved was reasonable.

23. Subcategory 13 includes 10 hours expended by Suizzo in researching the elements of a claim and defenses under the Travel Act, which was alleged as a predicate act by Campbell for the first time in the SAC.

Campbell claims that without testimony from Suizzo this time expenditure cannot be considered reasonable.

This Court concludes, based on its review and the already-identified considerations, that the time involved was reasonable.

24. Subcategory 14 includes approximately 311 hours spent in an in-depth analysis of the SAC and preparation of a motion to dismiss or, in the alternative, for summary judgment. Of the 311 hours approximately 119 were expended by paralegal Bene DeGraff ("DeGraff") in reviewing documents concerning the OMM project. Harris, J. Foran and Suizzo spent the balance of the time preparing the papers. Schal Defendants' motion was supported by a 65–page memorandum of law, six affidavits and approximately 70 exhibits.

Because Campbell's only objection to this time expenditure is the already-rejected contention that Schal Defendants should have focused on the Northwestern project instead of the OMM project, this Court finds the time expenditure was reasonable and awards Schal Defendants all the fees coming under this heading.

25. Subcategory 15 includes 15 hours in researching and preparing a memorandum in opposition to Campbell's motion to convert Schal Defendants' Rule 12(b)(6) motion into a summary judgment motion and in forming a response to Campbell's motion to stay Schal Defendants' alternative motion pending the close of discovery. Both Campbell motions were denied by this Court.

Campbell denies that a 15–hour expenditure was reasonable for this task.

This Court concludes, based on its review and the already-identified considerations, that the time involved was reasonable.

26. Subcategory 16 includes 16 hours spent in drafting a reply memorandum in support of the motion to dismiss the SAC.

Again Campbell denies the reasonableness of the time expenditure, claiming that it represents twice the amount of time a reasonable attorney would spend on a comparable project.

This Court concludes, based on its review and the already-identified considerations, that the time involved was reasonable.

27. Subcategory 17 includes approximately 56 hours expended by Harris and J. Foran in reviewing and analyzing Brandt's 69–page Statement of Genuine Issues, which was accompanied by 15 volumes of exhibits, and in preparing a Rule 26(f) memorandum.

Campbell again maintains that 56 hours is twice the time reasonably required to perform those tasks.

This Court concludes, based on its review and the already-identified considerations, that the time involved was reasonable.

28. Subcategory 18 included approximately 75 hours expended by Harris, Schultz, J. Foran and Peter Silverman ("Silverman") in response to Brandt's notice of voluntary dismissal without prejudice and his motion for leave to take a voluntary nonsuit. Concerned about the possibility of Campbell attempting to refile the case in another forum, Schal Defendants researched the exclusivity of federal court jurisdiction of RICO and researched and briefed the limitations on Brandt's right to obtain a voluntary dismissal without prejudice.

Campbell objects to the amount of time expended on those issues as excessive.

This Court concludes, based on its review and the already-identified considerations, that the time involved was reasonable.

29. Subcategory 19 includes approximately 64 hours expended by Harris and Silverman in preparing the Bill of Costs they were statutorily entitled to submit after the nonsuit. Schal Defendants admit that this appears like an excessive amount of time at first glance, but they maintain

that Campbell's challenge to the Bill of Costs required a detailed analysis of the entire Bill. Schal Defendants' response to Campbell's challenge included a supplemental affidavit by Harris and a memorandum.

Campbell objects to the number of hours attributed to that task on the ground that a bill had already been submitted to the clients, so that much of the work had already been done, and he also claims that much of the work performed for the Bill of Costs should have been accomplished by a paralegal.

This Court concludes, based on its review and the already-identified considerations, that the time involved was reasonable.

30. Subcategory 20 includes 15 hours relating to Schal Defendants' motion to clarify the record on appeal. Schal Defendants claim (a) that the motion was necessary because Brandt misrepresented to the Court of Appeals the nature of this Court's order granting the voluntary nonsuit and (b) that the hours were necessitated by Campbell's opposition to the motion, which resulted in two hearings.

Campbell maintains that this was a useless motion, as demonstrated by the facts that it was not referred to in the Court of Appeals opinion and that it was denied by this Court. Furthermore Campbell claims the motion is representative of the consistent overkill engaged in by Schal Defendants in their defense of this litigation.

This Court concludes, based on its review and the already-identified considerations, that the time involved was reasonable.

31. Subcategory 21 includes approximately 113 hours relating to miscellaneous services provided by Foran, Wiss & Schultz in the course of the litigation, including various court appearances, research projects, preparation of motions, conferences with the client or co-counsel, intra-office conferences and review of pleadings. Schal Defendants Ex. 36 identifies all of the services included in this category by placing the number 21 in the right-hand margin next to each item that falls into this subcategory.

While Campbell concedes that Schal Defendants are entitled to compensation for their court appearances, he maintains that the other expenses included this subcategory have not been identified specifically enough to warrant a finding that they were reasonable or necessary under the circumstances. Specifically, he complains that there is no explanation as to what these unspecified research projects, motions and conferences related to. In Campbell's view, the fact that no one other than Harris testified compounds the claimed vagueness problem.

This Court concludes, based on its review and the already-identified considerations, that the time involved was reasonable.

### 2. Category B—Discovery–Related Fees

32. Findings 79–81 (which correspond to Schal Proposed Findings ¶¶ 106–08) deal with discovery initiated by Schal Defendants in the federal case. Schal Defendants maintain that all of that discovery was reasonable in light of the allegations made by Campbell and that there is no basis for excluding any of the fees requested by them under those paragraphs.

Conversely, Campbell argues that Schal Defendants' admission in their Proposed Finding ¶ 109 that only half of their discovery requests were RICO-specific should mean that only half of their discovery fees under that heading should be chargeable to Campbell.

Campbell's logic is faulty. To the extent that any non-RICO-specific discovery yielded benefit only in the federal case and not in the state court litigation, Campbell's Rule 11 violation was a "but for" cause of the expense, which is therefore properly charged to him. On that score, Campbell maintains that although to date none of the discovery on the OMM project has produced any benefit in the state court case, the fact that the case is still pending makes it quite likely that at least some of the funds expended on discovery in that regard will ultimately benefit the litigants elsewhere. Therefore, Campbell says, he should not be made to pay the full price. But that possibility is wholly speculative, and there is no

reason to reward Campbell by way of a credit *now* because of some future contingency that may never come to fruition. Accordingly this Court awards payment of the entire amount to Schal Defendants, but without prejudice to Campbell's right to seek recoupment in the state court case if, when and to the extent that such a contingent benefit is realized by Schal Defendants.

33. Schal Defendants' motion to compel and related briefing on that motion make up the final component of Category B, amounting to $6,050 in attorney's fees. Campbell opposed that motion by arguing that Schal Defendants were not entitled to pursue discovery in the federal case due to Crescent's pending bankruptcy. As a result, J. Foran researched the effect of an automatic stay under the Bankruptcy Code on the ability of Schal Defendants to pursue the federal discovery. Ultimately Magistrate Weisberg granted almost aspects of the motion to compel, but due to plaintiff's nonsuit Schal Defendants never received the documents to which the motion was directed.

Campbell denies that it was reasonable to spend in excess of $6,000 on a motion to compel even in those circumstances.

This Court concludes, based on its review and the already-identified considerations, that the time involved was reasonable.

### 3. Category C—Appeal–Related Fees

34. Category C includes a total of approximately 233 hours expended primarily by Harris and Silverman in defending against the two appeals filed by Campbell, which were consolidated by the Court of Appeals. Findings 35 through 42 outline (a) the issues presented by the appeals that required Schal Defendants' attention and (b) the results in those appeals. Schal Defendants have requested $23,413.75 in fees for the appeal.

Campbell objects that it simply was not reasonable to spend more than $23,000 on defense of an appeal that dealt solely with the conditions attached to Crescent's volun-

tary dismissal. Similarly he argues that defense of an appeal from a Bill of Costs could not reasonably result in over $23,000 in attorney's fees, nearly twice the amount of costs that were awarded. Of course that line of reasoning misses the point—$23,000 was not spent on the defense of either of those items individually, but was instead the total spent on defense of both issues once consolidated. Even so, the reasonableness of that amount remains a question. Campbell also observes that one of the three issues on appeal related to the dismissal of Crescent's claim against Northwestern University and that Harris was the only defense attorney who participated in the appeal. Thus Campbell maintains that if any portion of the fees incurred related to Northwestern's defense, Schal is not entitled to recover them from Campbell. That objection appears sound as well.

In this area our Court of Appeals has viewed Rule 11 as

> a "make-whole" remedy to place the prevailing party in the position it would have been had the frivolous argument not been advanced in the district court.

(*Borowski*, 876 F.2d at 1342–43 and earlier cases cited there). That is one of the issues now before the Supreme Court in *Cooter & Gell* (see Conclusion 1). Unless and until the Supreme Court teaches otherwise, this Court is of course bound by *Borowski* and its predecessors. But here the problem is that this Court has no way effectively to carve the properly allowable amount away from the nonallowable matters, and that means that Schal Defendants have not sustained their burden of demonstrating what a reasonable allowance should be. This Court should not be put into the position of having to speculate or to do counsel's work for them where they have had ample opportunity to do that work themselves. It is constrained to deny this entire category for failure of proof on the part of Schal Defendants.

### 4. Category D—Rule–11–Related Fees [16]

35. Subcategory 1 includes the initial Rule 11 research and preparation of the

---

**16.** Services related to this Rule 11 proceeding

fall into five subcategories. As before, they will

motion and supporting memorandum, amounting to $6,223.75 in attorneys' fees. In preparing those documents Schal Defendants relied in part upon the summary judgment motion filed in the state court Northwestern case and upon the alternative motion for summary judgment in this case as to the OMM project.

Campbell simply denies that this portion of the fee is reasonable.

This Court concludes, based on its review and the already-identified considerations, that the time involved was reasonable.

36. Subcategory 2 includes Rule 11 research after the filing of the initial motion. More specifically, the services embraced an analysis of Campbell's response to the motion (including his 158–page Litigation Outline and supporting affidavits and exhibits) and preparation of the reply memorandum. Approximately 500 hours of attorney time, totalling $52,341.25 in fees, was expended in this effort—an effort that Schal Defendants maintain was necessitated by Campbell's avalanche of paper.

Campbell generously admits that this was a large project, but he argues that 500 hours was nonetheless an excessive amount of time to spend on the response.

This Court concludes, based on its review and the already-identified considerations, that the time involved was reasonable.

37. Subcategory 3 includes $40,913.75 expended in compiling Schal Defendants' initial and first supplemental fee petitions through March 15, 1989, discovery related to those fee petitions, an analysis of Campbell's responsive memorandum and the preparation of a reply memorandum in support of the fee petitions. Schal Defendants say that preparation of the petitions re-quired extensive analysis of the billing records of Foran, Wiss & Schultz, because throughout the course of the case Schal Defendants did not anticipate the ultimate filing of a fee petition under Rule 11 and they therefore had not been categorizing their billing from the start. Additionally they emphasize that this subcategory also includes time expended in response to Campbell's discovery requests and in opposition to a motion to compel by Campbell, none of which benefitted Schal Defendants outside of the context of this federal case.

Campbell argues that because all attorneys' fees incurred by Schal Defendants through the life of this case had been previously detailed in billing invoices from Foran, Wiss & Schultz, the compilation of the fee petition could not reasonably have cost so much. Campbell here accuses Schal Defendants of exercising no restraint whatever on their lawyers' time expenditures once they prevailed on the Rule 11 motion.

It is true that the types of considerations referred to in Conclusion 10—the effect of market forces and the relevant incentives on reasonableness of fees—do not operate with quite the same force once a Rule 11 motion has been granted on the merits. In that respect the case becomes somewhat more akin to the cases (*Hensley v. Eckerhart* and others) that require judicial scrutiny where fees are awarded to a prevailing party as a matter of course. But in this instance the need for such detailed and careful work by Schal Defendants' lawyers in the subcategory described in this Conclusion 37 is graphically demonstrated by the massive and detailed attack that has been launched by Campbell and is dealt with in these Findings and Conclusions.[17] This

be dealt with in turn. One point should be made at the outset that bears on the entire subject of fees on fees: Although Conclusion 34 has just rejected a portion of Schal Defendants' requested amount (about 6% of the total), that rejection is based much more on technical failure-of-proof considerations than on anything resembling a full disallowance of the category involved. In light of that fact and the concept that the fee award should be a function of the reasonableness of the services involved, this Court finds no reason to disallow any part of the work done on the Rule 11–related services themselves.

**17.** It really comes with particular ill grace for Campbell to dispute this item. This Court urged the litigants (as it does in every fee-shifting situation) to seek to narrow the issues as much as possible in an effort to minimize the scope of, if not obviate any need for, an evidentiary hearing. When those efforts were unsuccessful, it became painfully obvious that no aspect of what has been dealt with here would go unchallenged. What Schal Defendants' counsel did as

Court finds the entire amount requested reasonable.

38. Subcategory 4 includes Schal Defendants' attorneys' fees for the period of March 16 through July 25, 1989 (the second day of the evidentiary hearing),[18] totalling $16,647.50. Those services comprised a pretrial conference, research as to Campbell's finances in response to his attempted "inability to pay" defense, a deposition of Campbell on the inability-to-pay issue, preparation for the evidentiary hearing and the first two days of the hearing itself.

Campbell has lodged no objection to the fees requested in this subcategory. This Court finds they were reasonable, being neither duplicative nor excessive.

39. Subcategory 5 includes Schal Defendants' attorney's fees for the period from July 26, 1989 through November 30, 1989. Harris and Caruso expended 136 hours during that period, totalling $25,466.25. Those services included appearances and matters relating to the July 1989 evidentiary hearing, the Proposed Findings of Facts and Conclusions of Law and the Supplemental Findings of Fact and Conclusions of Law. Those fees were claimed in Schal Defendants' Fourth Supplemental Schedule of Fees filed December 5, 1989.

Campbell has interposed no objection to those items, and this Court finds them reasonable.

### 5. Miscellaneous Attorneys' Fee Included in the Petitions

40. There are certain services, encompassed within Schal Defendants' claim but not specifically discussed as separate subcategories there, that merit brief comment here. In December 1986 and January 1987 Foran, Wiss & Schultz senior partner Thomas A. Foran ("T. Foran") participated in an analysis of Schal Defendants' overall RICO defense strategy by way of conferences with Harris and contributions to the memorandum in support of the motion to dismiss the FAC. That activity occupied 9.75 hours.

Campbell's only objection to that time expenditure harkens back to his general objection that Schal Defendants should have launched a factual rather than a legal defense to the various complaints. On the basis of that theory Campbell argues that T. Foran's time would be compensable only if he had advised Schal Defendants to use the facts that were at their disposal.

This Court has already determined that Schal Defendants were not required to make a factual argument, and the issue need not be reexamined here. T. Foran's consultation was a reasonable expenditure of time, and the fees are properly assessed against Campbell.

41. Senior partner Schultz served initially as lead counsel before Harris' assumption of that role, spending approximately 21 hours on the case over a two-month period. His efforts included an initial analysis of the complaint and potential response, conferences with the client, discussions with Harris, a couple of early court appearances and drafting of a motion. After he turned the helm over to Harris, Schultz's only further involvement was to discuss the Answer to the Complaint and also Schal Defendants' strategy when faced with Campbell's decision to nonsuit the case.

Campbell claims that Harris' activity after the case was assigned to him was duplicative of Schultz's time and that fees incurred because of a change in lead counsel are not properly compensable. Campbell further objects that Schultz did not testify at the evidentiary hearing.

In the context of this case those arguments are unpersuasive. This Court concludes, based on its review and the already-identified considerations, that the time involved was reasonable.

42. Nicholas J. Etten ("Etten"), an attorney with substantial RICO experience, billed 2.5 hours in conferring with Harris

---

to this and ensuing subcategories was compelled by the nature of the opposition they encountered.

**18.** That also included the preparation of a third supplemental schedule of fees filed on July 26, 1989.

on the FAC and reviewing a draft of a reply memorandum in support of the motion to dismiss the FAC.

Despite that limited time expenditure, Campbell complains that Harris used Sullivan as his RICO consultant because of Sullivan's expertise and that there is no evidence that an additional consultation was necessary, reasonable or non-duplicative. Campbell also objects (as with the other lawyers except for Harris) that Etten did not testify.

This Court concludes, based on its review and the already-identified considerations, that the time involved was reasonable.

43. Associate Douglas R. Stevens ("Stevens") spent 5.25 hours on initial research relating to the complaint.

Campbell objects that Stevens' time entries are vague and appear duplicative of "initial research" performed by others. And Stevens too did not testify.

This Court concludes, based on its review and the already-identified considerations, that the time involved was reasonable.

44. Associate Carmen D. Caruso ("Caruso") spent 1.5 hours at the outset of the litigation in researching and preparing a short memorandum on the potential of freezing a defendant's assets in a civil RICO case. Caruso's next activity in the case came during the Rule 11 proceeding, when he expended some 46 hours in connection with Schal Defendants' reply memorandum on the Rule 11 liability issue, focusing primarily on Torshen's affidavit. Caruso spent an additional 72.25 hours in preparing for and participating in the evidentiary hearing: He deposed Campbell on the ability-to-pay issue and served as second chair to Harris at the hearing itself.

Campbell denies that the expenditure of 46 hours on the Torshen affidavit was reasonable but accedes to the balance of time charged by Caruso. Again Campbell objects that Caruso also didn't testify at the hearing.

This Court concludes, based on its review and the already-identified considerations, that the time involved was reasonable.

45. Associate Julie L. Murphy ("Murphy") expended 59 hours in researching issues raised by Campbell's motion to compel in connection with the discovery that he sought during the Rule 11 proceeding.

Campbell maintains that 59 hours in connection with a motion to compel is unreasonable and exorbitant—an objection compounded by the fact that Murphy did not testify.

This Court concludes, based on its review and the already-identified considerations, that the time involved was reasonable.

46. Associate Steve Gistenson ("Gistenson") expended 8.5 hours in researching the effect of Crescent's bankruptcy on Schal Defendants' right to pursue discovery in the federal case. That work was required in response to Campbell's assertion that Schal Defendants could not pursue such discovery and that Harris should be held in contempt for attempting to do so.

Campbell complains that it should not take an entire day to determine the effect of bankruptcy on discovery. Again Campbell notes that Gistenson did not testify.

This Court concludes, based on its review and the already-identified considerations, that the time involved was reasonable.

47. As to paralegal hours, Bonnie Winz's 14 hours, Shawna Johnson's 66.75 hours and approximately 75 of DeGraff's hours were expended in connection with Schal Defendants' production of documents to Crescent in the OMM Project. Schal Defendants produced to Crescent 54 long banker's boxes as well as additional files, and the paralegals reviewed all those documents for privilege purposes prior to production.

Campbell lodges no objection to the necessity or reasonableness of those hours, and this Court finds they were properly assessed to Campbell.

48. Paralegal Charlotte Zander expended 16.75 hours in assisting Harris in the preparation of the fee petition. Those hours too were reasonably spent and are properly assessed to Campbell.

5. Expenses

49. As reflected in Finding 72, Schal Defendants have included $8,631.75 for the services of their legal expert Torshen as part of the pre-July 25, 1989 expenses. This Court has previously held (121 F.R.D. at 390) that the submission of Torshen's affidavit on the liability issue, as well as that of Campbell's expert Stephen Sward ("Sward"), was ultimately unnecessary to the resolution of that legal question. However, Schal Defendants say that holding should not control the question whether Torshen's fees were reasonably incurred. Instead they maintain that Campbell's conduct (a) in arguing that their initial Rule 11 motion was deficient for lack of expert testimony and (b) in submitting Sward's affidavit in his opposition to the Rule 11 motion made it necessary for them to proffer some expert testimony. Failure to provide such testimony, they urge, would have left them open to the possibility that this Court would agree with Campbell and deny their motion for lack of such testimony. Thus they maintain their decision to retain Torshen, although this Court finally found his affidavit unnecessary, was reasonable in light of all the circumstances.

Campbell agrees that the retention of Torshen was reasonable but maintains there is no evidence—most notably no hourly detail of Torshen's time expenditure—to substantiate the assertedly excessive fees claimed for rendering his opinion.

Campbell is correct in his partial concession. As for quantifying the item, this Court concludes, based on its review and the already-identified considerations, that the time involved was reasonable.

50. As to the remaining expenses through July 25, 1889, Schal Defendants have provided proper back-up invoices and have offered the testimony of both Harris and Torshen as to the reasonableness of those expenses. Furthermore, Schal Defendants argue that it is of no consequence that this Court previously assessed certain of those expenses as costs against Brandt pursuant to the Bill of Costs, because Brandt never reimbursed Schal for those costs.

Campbell admits the reasonableness of all other expenses (detailed in Finding ¶ 71), except that he denies that it was reasonable to spend almost $17,000 on photocopying. He also maintains that Schal Defendants are not entitled to recover from Campbell any amount that this Court ordered Brandt to pay.

There is no reason that Schal Defendants should not receive an award for such amounts simply because another person is also liable for them (just as in the case of any joint and several liability). Of course only one satisfaction will be permitted, but the entire amount is approved as reasonable.

51. Expenses of $8,843.25 included in the Fourth Supplemental Fee Schedule (detailed in Finding ¶ 72) are also approved, given the absence of any objection by Campbell.

### Appropriateness of Sanction

52. *Borowski*, 876 F.2d at 1342 reconfirmed the compensatory objective of Rule 11:

> Our decisions in *Hays* [*v. Sony Corporation of America*, 847 F.2d 412 (7th Cir. 1988)] and *Gorenstein Enterprises v. Quality Care–USA, Inc.*, 874 F.2d 431 (7th Cir.1989), make clear that Rule 11 provides a "make-whole" remedy to place the prevailing party in the position it would have been had the frivolous argument not been advanced in the district court.

To be sure, that statement was made in a different context from the one dealt with in these final Conclusions. But this Court finds that the mindset it reflects is equally applicable to Campbell's invitation to reduce the amount of the recovery here in recognition of the hardship and embarrassment Campbell says he has already suffered in the form of adverse press reports, a legal opinion running against him and his personal decline in health. This Court is well aware of the authority allowing for consideration of such factors external to the lawsuit in the fashioning of Rule 11 sanctions, but the fact remains that the

decision as to an appropriate sanction is committed to the discretion of the trial judge (*Cheek v. Doe*, 828 F.2d 395, 397 (7th Cir.1987) (per curiam)).

53. As to the exercise of such discretion, the teaching of *Mars Steel Corp. v. Continental Bank N.A.*, 880 F.2d 928, 932 (7th Cir.1989) also provides helpful guidance:

> Rule 11 creates duties to one's adversary and to the legal system, just as tort law [legal malpractice] creates duties to one's client. The duty to one's adversary is to avoid needless legal costs and delay. The duty to the legal system (that is, to litigants in other cases) is to avoid clogging the courts with paper that wastes judicial time and thus defers the disposition of other cases or, by leaving judges less time to resolve each case, increases the rate of error. Rule 11 allows judges to husband their scarce energy for the claims of litigants with serious disputes needing resolution.

54. Campbell acted with flagrant disregard of both the *Mars*-identified duties (to the adversary and to the legal system) throughout the tortured history of this case. This Court has already identified the egregious nature of his conduct in the Opinion, but any post-hoc paper record does not do justice to the impact felt by the target of such unjustified litigation while it is in progress. It seems only appropriate that Campbell should be made to compensate his adversary for all of the harms he caused them. In response to any assertion that the amount involved is an overly burdensome sanction (and it is certainly a large number), this Court must observe that as large as it is, it still does not approach the true level of costs imposed by Campbell's conduct: After all, the real and significant judicial and systemic costs that resulted from Campbell's inattention to the second *Mars*-defined duty that Rule 11 imposes on litigants necessarily go uncompensated.[19]

\* \* \*

In summary, Schal Defendants are entitled to $351,664.96 from Campbell in way of Rule 11 sanctions. That amount represents the total amount of reasonable attorneys' fees and expenses incurred by Schal Defendants as a direct result of Campbell's Rule 11 violations. This Court requires a further submission from each of the parties on a single issue: what additional amount should be added to that figure as a sanction to give effect to the delay factor sustained by Schal Defendants in obtaining the recovery of substantial amounts incurred by reason of Campbell's Rule 11 violations. Accordingly the parties are directed to submit their respective proposals in that regard to this Court's chambers on or before May 9, 1990.

## APPENDIX A

### FINDINGS OF FACT

*The Parties*

1. The original plaintiff in this action (sometimes referred to as the "Federal case") was Crescent Corporation, a Delaware corporation ("Crescent"). Crescent's lead counsel was attorney David L. Campbell of St. Louis, Missouri ("Campbell"), who was admitted to the bar of this Court *pro hac vice.* On January 30, 1986, Crescent made an Assignment for the Benefit of Creditors to William A. Brandt, Jr. ("Brandt"), who substituted for Crescent as the party plaintiff on October 23, 1986. In early November, 1986, Campbell filed an appearance on behalf of Brandt and thereafter served as his lead counsel.

2. Defendant Schal Associates, Inc. ("Schal") is an Illinois corporation with its principal place of business located in Chicago, Illinois. Schal is engaged in various phases of the construction business, including construction management.

3. Defendant Richard C. Halpern ("Halpern") is the President of Schal. Defendant Evans N. Spileos ("Spileos") is also an officer of Schal. Schal, Halpern and Spil-

---

**19.** Those uncompensated costs of course include the major expenditure of effort reflected and summarized in the Rule 11 proceeding itself.

eos are sometimes collectively referred to herein as the "Schal Defendants".

4. The remaining defendants in this case were Northwestern University ("Northwestern"), M.O.W. Construction Company, Inc. ("M.O.W.") and a class of defendants defined in the pleadings as those persons who constitute all of the partners of One Magnificent Mile Partnership as of January 22, 1981, and their successors and assigns, and all of the partners of One Magnificent Mile Condominium Partnership as of January 22, 1981, and their successors and assigns (collectively the "OMM Owners").

*The Filing Of The Lawsuit*

5. Crescent filed this action on January 15, 1985, and the case initially was assigned to the Honorable Nicholas J. Bua. The original Complaint ("Complaint") was 52 pages in length and contained seven counts which related to three construction projects in Chicago: the Northwestern University Law School Project (the "Northwestern Project"); the One Magnificent Mile Project (the "OMM Project"); and the Chicago Board Options Exchange Project (the "CBOE Project").

6. Count I of the Complaint charged the Schal Defendants, Northwestern, M.O.W. and the OMM Owners with RICO violations and asked treble damages of $53.4 million dollars. The RICO count alleged, essentially, that the Schal Defendants and Northwestern had entered into a scheme to defraud Crescent by inducing Crescent to perform substantial extra work on the Northwestern Project in the belief that at the end of the work, Schal and Northwestern would issue a change order providing for additional payment(s) to Crescent. Crescent alleged that the work was assertedly authorized by Schal pursuant to an oral agreement with Crescent to do the work and to present a bill at the end of the job. Based on this purported "fraud in the inducement" scheme, Crescent alleged separate claims under 18 U.S.C. § 1962(a), (b), (c) and (d) and charged the Schal Defendants with a myriad of predicate offenses under 18 U.S.C. § 1961. There were no RICO allegations in the Complaint concerning the OMM Project or the CBOE Project, although the Complaint did allege that Schal issued false backcharges on the OMM Project.

7. Counts II, III and IV of the Complaint were state-law breach of contract actions against Schal and the project owners other than the owners of the CBOE Project. Those Counts involved widely differing damage claims as follows:

| COUNT | PROJECT | AD DAMNUM |
|-------|--------------|-------------|
| II | Northwestern | $4.1 million |
| III | OMM | $731,000 |
| IV | CBOE | $8,000 |

8. Counts V and VI of the Complaint were state-law *quantum meruit* claims against Schal and the owners of Northwestern (Count V) and OMM (Count VI). Count V asked the same damages as Count II, and Count VI asked the same damages as Count III.

9. Count VII of the Complaint was a state-law claim against all defendants for "fraud and deceit," asking total damages of $52.8 million (including $35 million in punitive damages and $10 million for loss of business reputation).

10. Federal jurisdiction was premised solely upon the RICO claim in Count I, as there was no diversity of citizenship.

*The Filing Of The Two State Court Lawsuits*

11. On January 21, 1985, Crescent filed a lawsuit against Northwestern and Schal in the Circuit Court of Cook County captioned *Crescent Corporation v. Northwestern University, et al.*, 85 CH 612 (the "State Court NW case"). The three count complaint contained state-law claims for mechanics' lien, breach of contract and *quantum meruit*. The total damages sought were approximately $4.1 million.

12. On March 26, 1985, Crescent filed a lawsuit in the Circuit Court of Cook County against Schal, M.O.W. and the OMM Owners captioned *Crescent Corporation v. Schal Associates, Inc., et al.*, 85 CH 2994 (the "State Court OMM case"). The three count Complaint contained state-law claims for mechanics' lien, breach of contract and

*quantum meruit.* Crescent requested approximately $684,000 in damages.

*The Schal Defendants' Initial Response In The Federal Case*

13. At the time the original Complaint was filed, the RICO cases of *American National Bank v. Haroco, Inc.* and *Sedima v. Imrex Co.* were pending in the United States Supreme Court.

14. On February 13, 1985, the Schal Defendants (and other defendants) presented a motion for an extension of time in which to answer or otherwise plead to and including 30 days after the Supreme Court rendered its opinions in *Haroco* and *Sedima.* Crescent objected to this motion. After the motion was briefed, Judge Bua granted the Schal Defendants' motion.

*Disposition Of The State Court NW Case Against Schal*

15. Northwestern and Schal responded to the complaint in the State Court NW case by filing a joint motion for summary judgment on all three counts. Contemporaneous with the briefing of this motion in 1985, the parties engaged in written discovery and Crescent took the depositions of two Schal employees. Oral argument on the summary judgment motion was presented on October 31, 1985, and very little occurred in the State Court NW case thereafter until July 8, 1987, when the court issued a memorandum opinion regarding the defendants' motion for summary judgment.

16. Subsequent to this ruling, there was no further discovery in the State Court NW case. In July 1989, Brandt (who had substituted for Crescent as plaintiff) voluntarily dismissed all remaining claims against Schal in the case.

*The Progress Of The State Court OMM Case*

17. In 1985, Schal and the other defendants responded to the complaint in the State Court OMM case by filing a motion to dismiss. Briefing of the motions was suspended in October 1985, because Schal, Crescent, M.O.W., the OMM Owners and various other interested parties jointly had commissioned a study of leakage problems on the OMM Project by certain consulting engineers known as Heitmann and Associates ("Heitmann") of St. Louis, Missouri. Heitmann did not issue its final report until January 1987. Virtually nothing occurred in the State Court OMM case between October 1985 and February 1987, except for periodic status reports to the court regarding the status of Heitmann's work. In January 1989, the State Court OMM case filed by Crescent was consolidated with two other State Court cases concerning the OMM Project, including an action brought by another subcontractor known as Milwaukee Marble Company, and another action brought by M.O.W. and the OMM owners. These consolidated State Court OMM cases remain pending at this time.

*The Schal Defendants' Response To The Original Complaint In The Federal Case*

18. The United States Supreme Court issued its opinions in *Haroco* and *Sedima* on July 1, 1985. By Minute Order dated July 31, 1985, Judge Bua stayed discovery pending a ruling on motions to dismiss which the defendants had represented they would be filing in response to the Complaint. On September 30, 1985, the Schal Defendants moved to dismiss the Complaint. Northwestern, and M.O.W. and the OMM Owners, filed separate motions to dismiss. Each of the motions to dismiss focused solely on the RICO count. After briefing, Judge Bua denied the Schal Defendants' motion on January 30, 1986. Judge Bua also denied the other defendants' motions to dismiss.

19. On March 13, 1986, the Schal Defendants filed their Answer to the original Complaint.

*Discovery In The Federal Case In 1986*

20. After the motions to dismiss were denied, the parties pursued written discovery in 1986. Specifically, the Schal Defendants responded to a request for production of documents, two sets of interrogatories and a request to admit. Crescent and/or Brandt also responded to the following discovery served by the Schal Defendants: one set of interrogatories and two requests for the production of documents. In addition, the Schal Defendants

filed a motion to compel in connection with Crescent's responses to the first request for production of documents, which was fully briefed and assigned by Judge Bua to Magistrate Weisberg for hearing. Finally, both the Schal Defendants and Crescent and/or Brandt noticed-up various depositions in 1986, although the only depositions taken in the case, at any time, were in connection with subpoenas *duces tecum* that the Schal Defendants had issued to various of Crescent's suppliers.

*Substitution Of Brandt As Party Plaintiff And Filing Of First Amended Complaint*

21. On October 16, 1986, Crescent moved for leave to amend its complaint. The Schal Defendants opposed the motion, arguing that Brandt, as assignee under Crescent's assignment for the benefit of creditors, was the real party in interest. Judge Bua set a briefing schedule, but the issue subsequently became moot when Brandt voluntarily substituted as party plaintiff for Crescent. By Minute Order dated November 17, 1986, Brandt was given leave to file a First Amended Complaint ("FAC"). In substantive terms, the RICO allegations in the FAC were the same as those in the original Complaint as set forth in paragraph 6 above, except that the *ad damnum* was reduced to $14.8 million after trebling. The FAC also included all of the aforementioned state law counts which had been included in the Complaint.

22. On December 18, 1986, the Judicial Executive Committee for the Northern District of Illinois reassigned the case to this Court.

23. The Schal Defendants, Northwestern, and M.O.W. and the OMM Owners filed separate motions to dismiss the FAC. These motions were directed to the RICO count, which was the sole basis for federal jurisdiction. The defendants contended, *inter alia*, that the alleged fraudulent scheme on the NW Project did not constitute an actionable pattern of racketeering activity. On February 2, 1987, the Court granted these motions and dismissed the FAC, without prejudice as to the Schal Defendants and Northwestern. At the same time, the Court dismissed M.O.W. and the OMM Owners without granting leave to replead. Also during the February 2, 1987 hearing, Campbell represented that the Schal Defendants had engaged in a separate fraudulent scheme on the OMM Project that, according to Campbell, was "virtually identical" to the alleged fraudulent scheme on the Northwestern Project. Campbell had not alleged a fraudulent scheme on the OMM Project in either the Complaint or the FAC, and the Court's decision to grant Brandt leave to further amend his pleading was predicated in large part upon Campbell's representation in open court.

*The Filing Of The Second Amended Complaint And The Schal Defendants' Response Thereto*

24. Campbell filed Brandt's Second Amended Complaint ("SAC") on or about February 11, 1987, naming only the Schal Defendants and Northwestern as defendants. The SAC contained a RICO claim in Count I which re-alleged virtually the same fraudulent scheme on the Northwestern Project as had been previously alleged. Unlike its predecessors, however, the SAC also alleged that the Schal Defendants engaged in a second and parallel "fraud in the inducement" scheme on the OMM Project whereby Crescent was fraudulently induced to perform non-contract work by promises of contract amendments upon completion of the Project.

25. Northwestern and the Schal Defendants filed separate motions to dismiss the SAC. The Schal Defendants also moved in the alternative for summary judgment under Fed.R.Civ.P. 56. Brandt initially responded by moving to convert the Schal Defendants' Rule 12 motion into a Rule 56 motion and to stay consideration of that motion pending further discovery. After briefing, Brandt's motion was denied in mid-April 1986.

26. The Court then advised the parties that it would address defendants' dismissal motions in the first instance and would entertain the Schal Defendants' alternative summary judgment motion only if the

RICO claim in the SAC survived the motion to dismiss.

27.  The parties completed briefing the motions to dismiss and, on July 6, 1987, the Court granted Northwestern's motion to dismiss.  However, because the SAC alleged the Schal Defendants' involvement in two similar schemes, their motion to dismiss was denied, and the attention of the Court and the parties turned to the Schal Defendants' motion for summary judgment.

*The Events Culminating In Brandt's Nonsuit*

28.  On July 13, 1987, the Schal Defendants converted their Rule 56 motion into a Rule 16 issue-narrowing motion which challenged the allegations in the SAC of an underlying fraudulent inducement scheme on the OMM Project.  At a hearing on that date, the Court directed Brandt and the Schal Defendants to file Rule 26(f) statements addressing the scope of discovery that should be permitted in order to resolve the Rule 16 motion.

29.  On or about August 4, 1987, Brandt filed a Rule 26(f) Statement, and also filed, under the label of Local Rule 12(f), a sixty-nine page Statement of Genuine Issues accompanied by seven affidavits and fifteen volumes of exhibits.  The Schal Defendants responded to Brandt's Rule 26(f) statement on August 24, 1987.

30.  On September 1, 1987, the Court ruled that Brandt's discovery in connection with the Schal Defendants' Rule 16 motion would be limited to fraud in the inducement issues on the OMM Project.  The Court directed the parties to appear on September 9, 1987 in order to discuss the scope of this discovery in more detail.

31.  However, on or shortly before that date, Campbell sought to dismiss this case by filing: a) Brandt's notice of dismissal without prejudice; and b) Brandt's motion for leave to take voluntary nonsuit.  On September 9, the Court set a briefing schedule, and, on September 25, 1987, granted a voluntary dismissal without prejudice under Fed.R.Civ.P. 41(a)(2).  The dismissal was subject to two conditions:

a.  Brandt had to pay the Schal Defendants' statutory costs.

b.  Any refiling of the RICO claim was to be in the Northern District of Illinois.

32.  The Court further ordered that Brandt's failure to comply with these conditions would, upon motion and entry of an appropriate order, convert the dismissal of the RICO claim without prejudice into a dismissal of the RICO claim with prejudice.

*The Schal Defendants' Bill Of Costs*

33.  On October 26, 1987, the Schal Defendants filed a Bill of Costs in the Federal Case requesting that costs be assessed against Brandt in the amount of $13,455.91.

34.  On November 16, 1987, the Court's Minute Clerk assessed costs against Brandt in the amount requested by the Schal Defendants.  Shortly thereafter, Brandt moved to set aside the taxation of costs and filed objections to the costs.  After consideration of these objections and the Schal Defendants' reply thereto, the Court entered a judgment against Brandt for $13,455.91 on December 29, 1987.

*Brandt's Appeals*

35.  On or about October 13, 1987, Campbell filed Brandt's Notice of Appeal to the Seventh Circuit.  Insofar as the Schal Defendants were concerned, the Notice stated that the appeal was from the judgment order previously entered on February 2, 1987 dismissing the FAC against the Schal Defendants without prejudice.

36.  On October 15, 1987, Campbell filed Brandt's Statement of Issues which asserted that the single issue on appeal with respect to the Schal Defendants was whether the FAC alleged a pattern of racketeering activity.

37.  By letter dated October 16, 1987, one of the Schal Defendants' attorneys wrote Campbell, inquiring whether Brandt intended to include the Schal Defendants as parties to the appeal.  Campbell responded that Brandt did not consider Schal to be a party to the appeal.

38.  On or about December 10, 1987, Campbell filed Brandt's initial appellate brief.  As to the Schal Defendants,

Brandt's brief raised a completely different issue than Campbell had articulated in the Notice of Appeal and Statement of Issues. Campbell stated in this brief that the issue was whether the trial court had abused its discretion when it granted Brandt's motion for a voluntary non-suit on September 25, 1987 by purportedly ruling that both Brandt's RICO claims and pendent state-law claims would be dismissed with prejudice if Brandt failed to pay the Schal Defendants' statutory costs.

39. On December 28, 1987, the Schal Defendants filed in this Court a motion to clarify the record and for other relief pursuant to Fed.R.App.P. 10(e). This Court found that it was clear from the record that the September 25, 1987 Order did not contemplate a dismissal with prejudice of the pendent state-law claims in the event that Brandt failed to comply with the conditions attached to the nonsuit and, therefore, denied the motion to clarify. The Court granted the Schal Defendants leave to supplement the Record on Appeal with their Motion to Clarify and the transcripts of proceedings from hearings held on December 28 and 29, 1987.

40. On January 12, 1988, the Schal Defendants moved to dismiss the appeal for lack of jurisdiction. Campbell opposed the motion and, by Order dated February 8, 1988, the Seventh Circuit ruled that it would consider the motion to dismiss with the merits.

41. On January 7, 1988, Campbell filed a separate Notice of Appeal from the judgment assessing costs against Brandt in the amount of $13,455.91. By Order dated February 22, 1988, the Seventh Circuit *sua sponte* consolidated the two appeals for purposes of briefing and disposition.

42. On June 1, 1988, the consolidated appeals were argued in the Seventh Circuit. On August 5, 1988, the Seventh Circuit affirmed the judgment for costs. With respect to the other appeal, the Seventh Circuit ruled that it lacked jurisdiction to hear the appeal and also affirmed on the merits this Court's September 25, 1987 Order relating to the nonsuit. *See Brandt v. Schal Associates, Inc., et al.*, 854 F.2d 948 (7th Cir.1988).

*The Schal Defendants' Rule 11 Motion— Liability*

43. On October 26, 1987, the Schal Defendants filed a Rule 11 motion against Campbell and a supporting memorandum. In the Rule 11 motion, the Schal Defendants alleged that Campbell never had a reasonable basis in fact to allege the fraudulent inducement schemes on either the OMM or Northwestern Projects. The Schal Defendants further asserted that many of Campbell's allegations of predicate acts under RICO either were not well grounded in fact or were not warranted by existing law or a good faith argument for the extension of that law.

44. On or about February 23, 1988, Campbell's attorneys filed a response to the Rule 11 motion, which included: 186 pages of memoranda, including a 158–page "Litigation Outline" that Campbell himself prepared; 54 pages of affidavits (in addition to 143 pages of affidavits which Campbell had previously filed on behalf of Brandt in opposition to the Schal Defendants' Rule 16 motion); and 252 exhibits (over and above 438 exhibits previously filed in connection with the Rule 11 motion). Included among these documents was the affidavit of Stephen Sward, an attorney who was retained as an expert on the "liability issue" on behalf of Campbell.

45. The Schal Defendants filed their reply to Campbell's response on May 9, 1988. The reply consisted of 124 pages of memoranda and 143 previously unfiled exhibits. The Schal Defendants subsequently filed an affidavit from attorney Jerome H. Torshen in response to Mr. Sward's affidavit which Campbell had filed.

46. On August 16, 1988, the Court found that Campbell had violated Rule 11 in connection with his allegations concerning both the OMM and Northwestern Projects, and granted the Schal Defendants' Rule 11 motion. The Court's opinion is reported at 121 F.R.D. 368.

*The Schal Defendants' Fee Petitions*

47. On September 2, 1988, the Schal Defendants filed a fee petition requesting

$262,756.25 in attorneys' fees and $27,-147.17 in expenses.

48. In response to the fee petition, Campbell's attorneys filed interrogatories and requests for production of documents on September 16, 1988. The Schal Defendants objected to these requests, and Campbell's attorneys filed a motion to compel on or about October 3, 1988. The motion to compel was denied, after it was fully briefed.

49. After the motion to compel was denied, Campbell's discovery requests were narrowed and, in December, 1988, the Schal Defendants' attorneys produced thousands of documents from their files to Campbell's counsel. A Protective Order and an amendment thereto were entered by the Court with respect to these documents and certain other aspects of the Rule 11 proceedings.

50. On January 5, 1989, Campbell's attorney served interrogatories upon the Schal Defendants and its counsel, which were answered on January 23, 1989.

51. On January 6, 1989, the Schal Defendants filed a supplemental schedule of fees and expenses covering the period September 1, 1988 through December 31, 1988. The Schal Defendants requested $17,465 in attorneys' fees and $1,196.89 in expenses.

52. On or about February 9, 1989, Campbell's attorneys filed a memorandum in opposition to the Schal Defendants' request for monetary sanctions.

53. On March 9, 1989, the Schal Defendants filed their reply to Campbell's memorandum.

54. On March 17, 1989, the Schal Defendants filed a second supplemental schedule of fees and expenses covering the period January 1, 1989 through March 15, 1989. The Schal Defendants requested $15,550 in attorneys' fees and $253.20 in expenses.

55. On July 26, 1989, during an evidentiary hearing which is discussed, *infra*, the Schal Defendants filed a third supplemental schedule of fees and expenses for the period March 16, 1989 through July 25, 1989 (the Schal Defendants' fee petition and three supplements thereto are collec-

tively referred to herein as the "fee petitions"). The Schal Defendants requested $16,647.50 in attorneys' fees and $156.95 in expenses. The Schal Defendants have not yet submitted any supplemental schedule of fees or expenses for the period after July 25, 1989, which included the last three days of the evidentiary hearing and the preparation of proposed findings of fact and conclusions of law.

*The Evidentiary Hearing In July 1989*

56. On May 10, 1989, the Court set an evidentiary hearing on the Schal Defendants' fee petitions for July 24, 1989. A pretrial conference regarding the evidentiary hearing was held on June 21, 1989.

57. At the pre-trial conference, Campbell's attorneys stated that they intended to raise his alleged inability to pay the monetary award requested by the Schal Defendants as a mitigating factor at the evidentiary hearing. Based on this representation, the Schal Defendants took Campbell's deposition on July 19, 1989. Following the deposition, the Schal Defendants moved to compel Campbell to produce various financial records which had been requested in connection with the deposition.

58. The evidentiary hearing commenced on July 24, 1989 and continued through July 28, 1989. At the hearing, the Schal Defendants presented the testimony of two witnesses: Jeff D. Harris, the Schal Defendants' lead counsel in this case; and Jerome Torschen, an attorney who testified as an expert witness regarding the reasonableness of the Schal Defendants' attorneys' fees and expenses.

59. Campbell's attorneys presented the testimony of three witnesses at the evidentiary hearing: Stephen Sward, an attorney who testified as an expert regarding the alleged unreasonableness of the Schal Defendants' attorneys' fees and costs; Dr. David Olhms, a physician-psychiatrist who testified on the subject of Campbell's mental and physical health; and Dr. Franklin Gafford, a physician who testified on the subject of Campbell's physical condition. Campbell elected not to testify at the evidentiary hearing.

60. On July 25, 1989, Campbell withdrew his prior contention that he lacks the financial resources to pay the fees and expenses requested by the Schal Defendants, and he expressly, knowingly and intentionally waived his right to have the Court consider his financial resources as an alleged defense or mitigating factor in the Court's adjudication of this matter. Based upon this waiver, Campbell agreed that the Court may consider the entire amount requested by the Schal Defendants as an amount which Campbell could pay. Subsequent to the evidentiary hearing, on October 17, 1989, the Honorable Emmett M. O'Brien granted summary judgment in Campbell's favor in a declaratory judgment action that Campbell's professional liability insurer had filed against him in the Circuit Court of St. Louis County, Missouri. Judge O'Brien ruled that Campbell's insurer is obligated to both defend and indemnify him in connection with this Rule 11 proceeding, and that the Schal Defendants' claim is a separate claim under the insurance policy, which has limits of $500,000 for each claim.

## APPENDIX B

### The Schal Defendants' Attorneys' Fees

62. At all times from January 1985 through the present, the Chicago law firm of Foran, Wiss & Schultz has represented the Schal Defendants in this case, and in the State Court NW and OMM cases. Foran, Wiss & Schultz is an approximately twenty lawyer firm which specializes in commercial litigation and also engages in criminal litigation. In general, Foran, Wiss & Schultz enjoys an excellent reputation in the Chicago legal community for the quality of its trial and litigation practice.

63. At the outset of this case in January 1985, Richard G. Schultz, a senior partner of Foran, Wiss & Schultz, was the lead counsel for the Schal Defendants. After a couple of months in 1985, however, another Foran, Wiss & Schultz partner, Jeff D. Harris ("Harris"), became lead counsel for the Schal Defendants in this case and the two related State Court cases. Harris has continued in that role for the duration of these cases.

64. Harris is a 1978 graduate of Washington & Lee University's School of Law in Virginia. He was admitted to the Illinois Bar in 1978, became associated with Foran, Wiss & Schultz at that time, and became a partner in the firm in January 1985. Prior to assuming the role of lead counsel in this case, Harris had been lead counsel in two other construction cases and had worked on a variety of other construction litigation. Harris also had tried two jury cases to verdict, including a federal civil rights trial that lasted approximately three months in which he had served as lead counsel. Harris also had appellate experience prior to becoming lead counsel in this case, having handled an estimated six appeals.

65. As lead counsel, Harris had overall responsibility for coordinating the litigation on behalf of the Schal Defendants, including the delegation of assignments to other lawyers and paralegals at Foran, Wiss & Schultz, and he personally reviewed and approved all of the legal fees charged by Foran, Wiss & Schultz. Harris is personally familiar with all of the legal services rendered by Foran, Wiss & Schultz on behalf of the Schal Defendants. At the July 1989 evidentiary hearing, Harris was the Schal Defendants' principal witness on the subject of their attorneys' fees and expenses, and his testimony was totally credible and strongly persuasive.

66. For the period from January 1985 through March 31, 1989, the attorneys' fees and expenses billed by Foran, Wiss & Schultz for its defense of the Schal Defendants totalled approximately $483,018, consisting of $445,598 in attorneys' fees and $37,420 in expenses (Schal Defendants' Ex. 9). The Schal Defendants' counsel have been paid in full for these services and expenses.

67. Between March 31, 1989 and July 25, 1989, the Schal Defendants incurred additional fees and expenses in the approximate amounts of $16,647.50 and $156.95, as reflected in the Third Supplemental Schedule of Fees and Expenses filed by the Schal Defendants on July 26, 1989. The Schal Defendants have not included their total

attorneys' fees of $462,245.00 (through July 25, 1989) in their fee petitions against Campbell for his Rule 11 violations. Instead, the Schal Defendants' fee petitions request attorneys' fees (through July 25, 1989) in the amount of $312,368.35, which is approximately 67.6% of the total amount of attorneys' fees incurred by the Schal Defendants through July 25, 1989 (Schal Defendants' Exs. 9, 10, 34).

68. The attorneys' fees charged by Foran, Wiss & Schultz that were included in the fee petitions are based on the following hourly rates: $145.00 for senior partners; $125.00 for other partners ($120 per hour in 1985); $90.00 for all associates, including senior associates; and $35.00 for paralegals, which included Peter A. Silverman, a 1987 law school graduate whom Foran, Wiss & Schultz billed at the paralegal rate prior to his admission to the bar in November of 1987. Campbell has not challenged the reasonableness of the hourly rates charged by Foran, Wiss & Schultz in this case, and the Court finds that these rates were reasonable.

69. The $312,368.25 in attorneys' fees included in the Schal Defendants' fee petitions is based upon 3069.25 hours of services rendered by the individual attorneys and paralegals at Foran, Wiss & Schultz, as follows:

| INDIVIDUAL ATTORNEYS | Total Hours |
| --- | --- |
| Thomas A. Foran | 9.75 |
| Richard G. Schultz | 21.00 |
| Nicholas J. Etten | 2.50 |
| Kenneth W. Sullivan | 229.50 |
| Jeff D. Harris | 1391.25 |
| Douglas R. Stevens | 5.25 |
| Carmen D. Caruso | 121.75 |
| John J. Foran | 241.25 |
| Steven H. Gistenson | 8.50 |
| Christine S. McGoey | 73.75 |
| Karen A. Suizzo | 183.00 |
| Peter A. Silverman | 340.75 |
| Julie L. Murphy | 59.00 |

| PARALEGALS | |
| --- | --- |
| Peter A. Silverman * | 70.25 |
| Bonnie Wintz | 14.00 |
| Bene DeGraff | 215.25 |

* (See Finding 68).

| PARALEGALS | |
| --- | --- |
| Shawna Johnson | 66.75 |
| Charlotte Zander | 16.75 |
| TOTAL: | 3069.25 |

(Schal Defendants' Exs. 11, 34).

70. The legal services rendered by Foran, Wiss & Schultz, which comprise the attorneys' fees component of the fee petitions, fall into four broad categories:

A. Services related to the analysis of plaintiff's Complaint, FAC and SAC; preparation of the Schal Defendants' pleadings; legal research, analysis and briefing of motions and related memoranda; court appearances; intra-office conferences among Foran, Wiss & Schultz attorneys and paralegals; and conferences with the clients or co-counsel;

B. Services related to discovery, including the Schal Defendants' responses to the plaintiff's discovery requests and discovery initiated by the Schal Defendants;

C. Services related to the plaintiff's appeals to the Seventh Circuit; and

D. Services related to the Rule 11 motion.

### APPENDIX C

*The Schal Defendants' Expenses*

142. In addition to their attorneys' fees, the Schal Defendants claim expenses in the amount of $28,400.96 against Campbell for the period ending July 25, 1989 (*See* Schal Defendants' Exs. 20, 34). These expenses include the professional fees for an affidavit from Jerome Torshen, as well as costs related to photocopying, subpoena and witness fees, travel, transcripts from hearings, federal express delivery services (which were used primarily to serve documents upon Campbell in St. Louis) and computer-assisted legal research, as follows:

| EXPENSE CATEGORY | AMOUNT |
| --- | --- |
| Photocopying: | $16,907.93 |
| Subpoena and Witness Fees: | $ 1,648.20 |
| Travel: | $ 364.00 |
| Transcripts from Hearings: | $ 417.00 |
| Federal Express: | $ 302.11 |
| Computer Research: | $ 129.77 |

EXPENSE CATEGORY | AMOUNT
Fees of Expert Witness: | $ 8,631.75

TOTAL: $28,400.96

(Schal Defendants' Exs. 20, 34).